LANDRY, Judge.
Defendants, Jerry W. Travis, Dairy Farmers Trucking Association, Inc. (Travis’ employer) and Southern Farm Bureau Casualty Insurance Company (Dairy Farmers’ insurer), appeal from a judgment awarding plaintiff damages for personal injuries and property damages sustained and incurred when plaintiff’s left turning vehicle was struck by an overtaking milk tank truck being operated by Travis while in the scope and during the course of his employment by Dairy Farmers. We affirm.
Appellants allege the trial court erred in absolving plaintiff of negligence proximately causing the accident and, in the alternative, awarding plaintiff excessive damages for personal injuries.
The accident occurred at approximately 6:15 A.M., April 26, 1969, on two lane, paved highway 51, Tangipahoa Parish, at a point approximately 6.1 miles south of Interstate Highway 55. The day was clear and the highway dry. The accident occurred near the point where Highway 51, running in a northerly-southerly direction, crosses Owl Bayou, the area being purely rural in character. The improved portion of the highway is approximately 22 feet wide. On the east side of the highway, adjacent to the bridge spanning Owl Bayou, is situated a graveled parking area containing a well which furnishes water for public use. On the west side of the highway, opposite the well site, is located a boat launching ramp used by sportsmen and by residents of the Owl Bayou area whose homes are accessible only by water. The well site and launching area are both used by sportsmen and local residents for parking vehicles.
On the morning of the accident, plaintiff, a resident of Owl Bayou, was proceeding southerly along Highway 51, in his *700 1966 Model Ford Falcon Tudor, at a speed of approximately 45 to 50 miles per hour, en route to his home. As plaintiff neared the parking area and boat launching site, he slowed his vehicle to approximately 10 miles per hour and commenced a left turn into the parking area on the east side of the highway. The milk truck, which was in the act of passing plaintiff’s vehicle, struck plaintiff’s car, the impact occurring in the left or northbound lane of travel. The right front fender of the milk truck struck the left door of plaintiff’s automobile. The impact occurred when the front wheels of plaintiff’s vehicle were approximately one to two feet onto the east shoulder of the highway. It is conceded that at the moment of impact, plaintiff’s vehicle completely blocked the northbound lane of travel. The following pertinent facts are either conceded or conclusively established in the record. The milk tank truck-tractor combination was 52 feet long and weighed approximately 70,000 pounds, including its load of milk; the milk truck pushed plaintiff’s vehicle a distance of 162 feet south of the point of impact where the Falcon and milk truck came to rest in the southbound lane of the road; the milk truck left skid marks from the point of impact to the spot where it came to rest, and plaintiff’s vehicle was struck broadside by the right front fender of the milk truck.
Appellants, relying primarily upon Wilson v. Louisiana Department of Highways, La.App., 254 So.2d 65, invoke the often proclaimed rule that a left turning motorist is held to a high degree of care, and that a driver executing such a maneuver is negligent if he fails to continuously look to his rear before making the turn in order to ascertain that the turn can be made in safety-
As in all cases of this nature, only factual matters are involved.
No citation of authority is needed in support of the proposition that where factual determinations are concerned, the decision of the trier of fact will not be disturbed unless shown to be manifestly erroneous. We find no such error in this instance.
Plaintiff testified he had been driving at a speed of about 45 miles per hour. When he reached a point a block to a block and a half north of the parking area, he slowed to about 30 miles per hour. At this time, he noticed a red pick up truck immediately behind him, and also saw the milk truck behind the pick up truck. When about three-quarters of a block from the parking area, plaintiff extended his left arm indicating an intended left turn, and also activated his left turn signal. He also looked in his rear view mirror at this time and noted the driver of the pick up truck had extended his arm to a stop signal position. He then checked both his inside and outside rear view mirrors, as he commenced his turn, and observed no traffic in the left or passing lane. He last saw the milk truck just before commencing his turn, at which time the milk truck was approximately 100 to 150 yards to his rear and the intervening pick up truck was about 50 feet behind plaintiff’s vehicle. Plaintiff also stated he never again looked in his rear view mirror; that he was traveling 10 to 15 miles per hour when he began his turn, and that he never heard a horn blow. Plaintiff was emphatic in his testimony that immediately before commencing his turn, he consulted his rear view mirrors and observed that the northbound or passing lane was clear of traffic at that time.
Plaintiff’s version of the accident was corroborated by an acquaintance, Lamar Blount, who was standing near the well in the parking area. Blount had recognized plaintiff’s approaching vehicle and was waiting to talk with plaintiff. In essence, Blount stated that when plaintiff reached a point about 100 yards north of the parking area, plaintiff gave a left turn hand signal, and also turned on his left turn indicator. Plaintiff’s vehicle was being followed by a pick up truck about 40 feet to the rear *701 thereof. The driver of the pick up was giving a hand signal indicating stop or slow down. At about this same time, Blount noted the milk truck approximately 100 yards to the rear of the pick up truck. His attention was directed to the milk truck because that vehicle was coming on pretty fast. Plaintiff entered the northbound lane before the milk truck commenced its passing maneuver. When the left front wheel of plaintiff’s vehicle crossed the center line of the highway, Travis’ truck was about 60 feet behind the pick up truck which was then 30 to 40 feet behind plaintiff’s automobile. When the left front wheel of plaintiff’s car reached the center of the northbound lane of the highway, the milk truck had reached a point where “ . . .he was going to have to turn or run over the back of the pick up . . . ” At this point, the milk truck started around the pick up truck and successfully passed that vehicle. The milk truck could not pass plaintiff’s vehicle, however, as plaintiff’s car was then at least half way across the northbound lane. Blount also stated that the milk truck was about 50 feet behind the pick up truck when Travis began his passing maneuver. Blount did not hear a horn blow.
William McKay, who was standing in the boat launching area west of the highway, observed plaintiff’s approaching vehicle when it was about 150 yards away. He noted that plaintiff’s left turn indicator was in operation. Behind plaintiff he saw the pick up truck and behind the pick up, he observed the milk truck. When plaintiff reached the point of hi s intended turn, the pick up was about its length behind plaintiff’s car. The milk truck was then about triple its length behind the pick up truck. He estimated plaintiff’s speed at this time at about 10 miles per hour, and the speed of the milk truck at approximately 50 miles per hour. He saw the milk truck pass the pick up just as plaintiff was about to commence his turn. The milk truck passed the pick up, and when the milk truck reached a point about half way between the pick up and plaintiff’s car, plaintiff started his turn. McKay did not hear a horn blow.
Defendant Travis testified he was familiar with the area, and knew of the presence of the parking areas on each side of the highway at Owl Bayou. He was proceeding at a speed of 45 to 50 miles per hour. He passed tfié pick up truck and pulled into the southbound lane behind plaintiff’s vehicle. He then continued in the southbound lane behind plaintiff for approximately one minute, and then prepared to pass plaintiff’s car. He activated his own left turn signal and proceeded into the passing lane. At this time, he saw no indication whatsoever by plaintiff of an intent to turn left, either by hand signal or signal device. When he reached a point about 15 feet from the rear of plaintiff’s car, he then being about 30 to 40 feet from the point where plaintiff intended to turn, he noted the brake lights of plaintiff’s vehicle come on. He blew his horn, but to no avail because plaintiff immediately commenced his turn at which moment the front bumper of the milk truck was even with the rear bumper of plaintiff’s car. As plaintiff began his turn, Travis applied his brakes and attempted to swerve to the left, the left wheels of the tractor going onto the east shoulder of the road. Travis estimated that plaintiff was traveling about 10 miles per hour at the moment of impact.
Travis’ account of the accident was corroborated by his acquaintance-guest passenger, Maurice J. Bridges, who had gone along with Travis for the ride.
The trial court' obviously accepted plaintiff’s narration of the circumstances, and concluded that plaintiff had indeed looked to his rear immediately before turning, at which time the passing lane was clear of traffic. We find no error with this conclusion which appears consistent with the physical facts. Undoubtedly, Travis was proceeding at a much faster *702 rate than plaintiff in attempting to pass. This circumstance renders Travis’ version of the accident most unlikely. If Travis’ much faster moving vehicle were even with the rear of plaintiff’s vehicle when plaintiff commenced his turn, as Travis testified, it appears more probable that the contact between the vehicles would have produced a side swiping type of collision rather than the broadáíde impact which actually occurred. Under the circumstances, we find no error in the trial court’s conclusion that plaintiff exercised the high degree of care demanded of a left turning motorist, and that the accident resulted solely from the negligence of defendant Travis.
Plaintiff was treated by Dr. Merlin Allen, who found plaintiff suffering from an arch shapd laceration of the scalp measuring 12 inches in length. Dr. Allen also noted mild brain concussion which produced partial amnesia. The scalp wound required from SO to 75 sutures to close. The area thereby affected has been rendered permanently numb. Dr. Allen noted that plaintiff’s confusion resulting from the concussion cleared up in two or three days. Dr. Allen also found a bi-malleolar fracture of plaintiff’s left ankle, for the treatment of which he enlisted the services of Dr. Louis F. Matta, Orthopedic Surgeon. Plaintiff remained hospitalized under Dr. Allen’s care for 9 days, following which plaintiff was discharged from the hospital in a long leg cast. During the ensuing eight months, plaintiff was seen by Dr. Allen approximately IS times. Plaintiff remained on crutches for quite some time. During plaintiff’s visits to Dr. Allen, plaintiff complained of dizziness and pain and swelling in the area of the injured ankle.
Dr. Allen testified plaintiff sustained a permanent 25% disability of the left ankle which rendered plaintiff incapable of climbing. Dr. Allen examined plaintiff in court on the day of the trial and found the injured ankle swollen; he also noted 50% limitation of ankle motion on this occasion. He considered both conditions to be permanent.
Dr. Matta treated plaintiff primarily for the ankle injury. He found an open bi-lateral fracture of the left ankle. To repair the injury, Dr. Matta performed an open reduction arid internal fixation of the medial malleolus using a stainless steel screw and of the lateral malleolus using an intramedullary Rush nail. He considered plaintiff had an uneventful recovery. On May 10, 1969, Dr. Matta found some swelling of the injured ankle and noted that plaintiff then complained of some dizziness. X-rays taken on this occasion showed good alignment of the fracture sites. When plaintiff returned May 28, 1969, Dr. Matta shortened the leg cast, but noted that plaintiff related episodes of dizziness and black out spells. On June 21, 1969, Dr. Matta noted moderate swelling of the ankle. Dr. Matta advised plaintiff to continue walking with the aid of crutches until plaintiff felt he could walk without such aid. On July 24, 1969, plaintiff returned to Dr. Matta, who removed plaintiff’s walking cast and applied an ace bandage to the injured ankle. He advised plaintiff to continue walking with crutches. On September 26, 1969, Dr. Matta found plaintiff ambulating well. He noted minimal swelling of the ankle and some stiffness which condition was expected to improve. Dr. Matta discharged plaintiff with the admonition to return if plaintiff experienced further difficulty.
It is conceded that plaintiff, a 53 year old carpenter, sustained a back injury while employed as a carpenter approximately two years before subject accident. Plaintiff’s claim for compensation was settled on the basis of his total and permanent disability. From the time of said prior injury to the date of subject accident, plaintiff was unemployed except for the performance of occasional light carpenter *703 for acquaintances and friends. Plaintiff and his brother, Fred Gill, a building contractor, testified in essence that a few days before subject accident, plaintiff had agreed to commence work for his brother the following week for an agreed hourly wage of $4.00, and work a guaranteed 40 hour week.
Plaintiff testified to the weakened condition of his ankle. He also stated his ankle had a tendency to turn very easily. As a result, he was required to be most careful to avoid stepping on any object to prevent falling. He also attested that his ankle still swells and is painful at times.
The trial court awarded plaintiff total damages in the sum of $17,577.66. Plaintiff established special damages in the sum of $2,577.66, including $1,000.00 as the value of his totally destroyed vehicle. It is obvious, therefore, that the trial judge allowed plaintiff the sum of $15,000.00 as compensation for his pain and suffering, disability and loss of future earnings. Defendants urge this latter award is excessive.
While we attach little weight to the testimony regarding plaintiff’s prospective employment by his brother, nevertheless we feel that the 25% permanent disability to plaintiff’s ankle will undoubtedly restrict his future employability and result in indeterminate loss of earnings. Considering the nature of plaintiff’s injuries, the recurring dizziness resulting from his concussion, the permanent disability to his ankle, and the pain and discomfort that will result therefrom, as well as the effects of his total injuries on his future employability, we find no abuse of discretion by the trial court in awarding plaintiff the sum of $15,000.00 for these items of damages collectively.
The judgment of the trial court is affirmed at appellants’ cost.
Affirmed.